# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### SEPTEMBER SESSION, 1998

FILED

January 13, 1999

Cecil Crowson, Jr.
Appellate Court Clerk



| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. NO. 02C01-9708-CR-00317 |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | SHELBY COUNTY |
| VS. | ) | |
| | ) | HON. L.T. LAFFERTY |
| ROY E. KEOUGH, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (First Degree Murder; Attempted |
| | ) | Murder; Death Penalty) |

## ON APPEAL FROM THE JUDGMENT OF THE CRIMINAL COURT OF SHELBY COUNTY

FOR THE APPELLANT:

James V. Ball
Joseph S. Ozment
217 Exchange Avenue
Memphis, TN 38105

FOR THE APPELLEE:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Kathy Morante
Deputy Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

John W. Pierotti
District Attorney General

Robert Carter
Rosemary Andrews
Assistant District Attorneys
201 Poplar Avenue
Memphis, TN 38013

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, Roy E. Keough, was convicted in the Shelby County Criminal Court for the premeditated first degree murder of his wife, Betty Keough, and the attempted first degree murder of Kevin Berry. The jury found that Defendant had previously been convicted of one or more felonies for which statutory elements involve the use of violence to the person, see Tenn. Code Ann. § 39-13-204(i)(2); and it sentenced Defendant to death. Defendant also received a forty-year sentence for the attempted murder count, to be served consecutive to his death sentence.

In this direct appeal, Defendant argues (1) that the trial court erred by finding that Defendant's communication with separate police officers constituted separate and distinct statements rather than a single statement, and that the court therefore erred by disallowing admission of the subsequent communication following introduction of the prior; (2) that the evidence is insufficient to support his convictions as a matter of law; and (3) that the trial court erred by failing to hold the death penalty unconstitutional as applied in this state. We find no error and affirm the judgment of the trial court.

The deceased victim in this case, Betty Keough, was Defendant's estranged wife. Their marriage was troubled, and they separated several months prior to the murder. After the separation, Defendant lived with his girlfriend in a room that they rented from the girlfriend's brother, Bobby Holly. A few weeks

prior to the murder, Defendant and his girlfriend moved; and the surviving victim, Kevin Berry, moved into the residence that they had occupied.

On the day of her murder, Ms. Keough went to Defendant's former residence to find her estranged husband. There, she met both Berry and Holly for the first time. Holly testified at trial that Ms. Keough told him she had a gun in her car and that she intended to kill Defendant if she found him. After this first visit, Ms. Keough returned to the home twice more searching for Defendant. During her third visit, Ms. Keough convinced Berry to have a drink with her. The two drove Ms. Keough's car to Irene's Grill, where Ms. Keough was a regular patron. They entered the bar, found a table, and each ordered a beer.

Between Ms. Keough's second and third visits to Berry's residence, Berry saw Defendant and told him that his wife had been looking for him. Shortly after Ms. Keough and Berry left for Irene's Grill, Defendant arrived at Berry's residence to see if his wife had returned. Holly, who was there at the time, testified that for some reason, Defendant parked his car where it could not be seen from the house. Holly told Defendant that his wife had been there but had gone with Berry to the bar. Holly testified that Defendant seemed very calm and did not appear to have been drinking.

Approximately ten to fifteen minutes behind the victims, Defendant entered the bar. He ordered a beer, but the owner of the bar refused to serve him; although she testified that she did not believe him to be drunk. Defendant then walked over to where the victims were seated and began talking loudly with his wife. At that time, the owner of the bar asked them all to leave. The owner

testified that she did not overhear any conversation or suspect that there was any "trouble," but she was concerned because she did not know how Defendant felt about Ms. Keough being there with Berry.

Berry testified that, once outside, the three walked to Ms. Keough's car; and Defendant and Ms. Keough exchanged some words. According to Berry, Defendant then shoved the victim with both hands, "and he put some force behind it." Berry did not see the victim touch Defendant. Berry stated that he reacted by taking a step forward and saying, "[W]ait a minute," at which time Defendant, without saying a word, stabbed him in the chest with a bayonet. Berry testified that he did not touch or threaten Defendant before the stabbing. After being stabbed, Berry turned and ran behind a van in the parking lot, but Defendant chased him and stabbed him a second time in the thigh. Berry then pushed Defendant aside and fled toward the back door of the bar, but Defendant again caught up with him about five feet from the back door and stabbed him a third time in the back. Finally, Berry escaped into the bar, where he asked for someone to call the police and an ambulance.

The evidence at trial showed that Defendant then returned to Ms. Keough. He stabbed her in the neck with the bayonet and locked her inside the car, where she bled to death over the next several minutes. After killing his wife, Defendant disposed of the bayonet. He then called his girlfriend and attempted to borrow enough money to leave town. When he was unsuccessful, he contacted his attorney and waited for the police. A short time later, the police arrested him and took him into custody.

The following day, Detective James Nichols interviewed Defendant. Nichols testified that upon establishing that Defendant was coherent, he informed him of his Miranda rights. Defendant told Nichols that he had an attorney and wanted him present during any questioning. After conferring with Defendant, his attorney told Nichols that Defendant was willing to provide a statement. Defendant told Nichols that he had found his wife in a bar with another man. He and his wife started arguing and they were asked to leave. Once outside, the argument escalated and he stabbed his wife with a "rifle knife." Defendant also admitted that he stabbed Berry when Berry tried to intervene. Nichols testified that Defendant told him he did not remember how many times he stabbed the two individuals because "he was angry or something to the effect that his emotions were so high." Defendant told Nichols that he had wanted to retrieve the car he had bought for his wife because he found her with another man.

Defendant agreed to give a formal typewritten statement to police. Detective Nichols had to respond to another matter and, therefore, asked two other officers, Sergeants Sullivan and Stewart, to take the statement. Nichols had taken notes from his oral interview, but it does not appear that he gave these notes to Sullivan and Stewart before he left the station. Sullivan and Stewart moved Defendant to another room where, in the presence of his attorney, they re-read Defendant his Miranda rights. They then took a formal statement, which was largely similar to the information Defendant had conveyed to Nichols; but Defendant additionally alleged that his wife carried a gun and had previously shot at him. When the State called Detective Nichols to testify at trial, he recounted the oral statement that he had taken and was subject to cross-examination thereon. The defense was precluded on cross-examination, however, from

-5-

revealing the allegations contained in the statement taken by Sergeants Sullivan and Stewart.

## I. ADMISSIBILITY OF STATEMENT TO POLICE

Defendant first argues that the trial court erred by refusing to allow defense counsel to cross-examine Detective Nichols about the typewritten statement taken by Sergeants Sullivan and Stewart. The excluded statement, he contends, would have supported his claim of self-defense or the lesser offense of manslaughter because it contained statements that the victim carried a gun and had previously shot at Defendant. Citing Sambolin v. State, 387 S.W.2d 817 (Tenn. 1965), and State v. Robinson, 622 S.W.2d 62 (Tenn. Crim. App. 1980), Defendant argues that once the State introduces a portion of his statement or confession, he is entitled to introduce the entire statement, including any exculpatory or self-serving statements.

This Court has stated,

"When a confession is admissible, the whole of what the accused said upon the subject at the time of making the confession is admissible and should be taken together; and if the prosecution fails to prove the whole statement, the accused is entitled to put in evidence all that was said to and by him at the time which bears upon the subject of controversy including any exculpatory or self-serving declarations connected therewith."

Espitia v. State, 288 S.W.2d 731, 733 (Tenn. 1956) (emphasis added) (quoting 20 Am. Jur. § 488). Nevertheless, this Court rejected the proposition that "all statements by a defendant become admissible at trial upon introduction of a part of one of them." State v. Ralph Eugene Jenkins, No. 98, 1986 WL 6267, at *2 (Tenn. Crim. App., Knoxville, June 3, 1986). The determinative question here is

whether Defendant's communications with the different officers amounted to a single statement or separate statements.

Defendant argues that the typewritten statement was merely a continuation or reduction to writing of the oral interview conducted by Detective Nichols. To support this assertion, Defendant relies heavily on the temporal proximity of the statements. Although possibly relevant when examining admissibility of two statements made to the same officer, we conclude that the temporal proximity of the statements is not controlling here.

As noted above, the material difference between the statements was Defendant's allegation in the latter statement that his wife carried a gun and had previously shot at him. It is precisely because of this substantive difference that Defendant wanted the trial court to admit the second statement. However, this difference also militates against a finding that the second statement was merely a reduction to writing of the first—the two were simply not the same statement.

Nor was the second statement a continuation of the first. The second statement was taken in a different room by different officers, who were apparently unaware of what Defendant had told Detective Nichols. Despite the presence of Defendant's counsel, Sullivan and Stewart again informed Defendant of his rights. Any continuity between the two statements was thereby broken. As noted above, the cases hold that other statements made "at the time of making the confession" are admissible. The record clearly reflects that Defendant gave statements at two distinct "times" when the appellant gave a statement.

Accordingly, the second statement was neither a part of, nor a continuation of, the first.

Furthermore, because Nichols was not present during the second interview, it would have been inappropriate for him to testify regarding the substance of the statement obtained by Sullivan and Stewart. See Tenn. R. Evid. 602; see also State v. Catherine Ward, No. 01C01-9307-CC-00224, 1996 WL 38867, at *8 (Tenn. Crim. App., Nashville, Feb. 2, 1996) (concluding that "[n]either [the officer's] participation in the investigation nor his role as lead investigator permitted him to testify to facts outside his personal knowledge").

For these reasons, we conclude that Defendant's statement to Sergeants Sullivan and Stewart constituted a separate statement for the purpose of admissibility. The trial court did not err by precluding cross-examination of Nichols regarding the content of the subsequent statement. In addition, we note that even if the exclusion of the latter statement were error, we would find no prejudice because Defendant was able to introduce through another witness testimony that the victim had claimed to be carrying a gun and had threatened to kill Defendant. This issue lacks merit.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant next contends that the evidence is insufficient to support his convictions for premeditated first degree murder and attempted first degree murder. Specifically, Defendant argues that he conceived his decision to execute the attacks during the heat of passion. He argues that evidence of his impassioned state, resulting from the "heated" argument with his wife outside the

-8-

bar, was sufficient to negate the element of premeditation. Similarly, he further argues that proof of his intoxication was sufficient to negate his ability to form an intent to kill. Thus, Defendant submits that the proof supports only a finding a voluntary manslaughter for the killing of his wife, Betty Keough.

When an appellant challenges the sufficiency of the evidence, this Court must determine whether, after viewing the evidence in a light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). "[T]he State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of witnesses, the weight and value to be given to the proof, and all factual issues raised by the evidence are resolved by the trier of fact. See id. This Court will not re-weigh or re-evaluate the evidence. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Moreover, a guilty verdict removes the presumption of innocence enjoyed by defendants at trial and replaces it with a presumption of guilt. See id. Thus, a defendant challenging the sufficiency of the evidence carries the burden of illustrating to this Court why the evidence is insufficient to support the verdict. See State v. Freeman, 943 S.W.2d 25, 29 (Tenn. Crim. App. 1996).

At the time of Defendant's offense, first degree murder was defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "Intentional" is defined as the "conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-106(a)(18). Premeditation requires "the exercise of reflection and judgment," id. § 39-13-202(d), and "a previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citing McGill v. State, 475 S.W.2d 223, 227 (Tenn. Crim. App. 1971)). However,

> It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d).

The existence of premeditation and intent are questions for the jury. Like other elements of a crime, these may be established by circumstantial proof. See State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992) (finding that "the necessary elements of first-degree murder may be shown by circumstantial evidence"). Some pieces of evidence in the case at bar that have been recognized as supportive of the existence of premeditation and intent include the use of a deadly weapon upon an unarmed victim; calmness immediately after the killing; facts that indicate planning, such as Defendant's arrival at the bar armed; facts about Defendant's prior relationship with the victim from which motive may be inferred; and facts about the nature of the killing. See, e.g., State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn.

Crim. App. 1995) (citing 2 W. LaFave & A. Scott, Jr., Substantive Criminal Law § 7.7 (1986)).

In the present case, the evidence most favorable to the State demonstrated that when Defendant heard that his wife was looking for him, he went to his former residence to find her and parked his car where it could not be seen from the house. When he learned that Ms. Keough and Berry had gone to the bar, he remained calm and collected and went there to find them. At some time prior to arriving at the bar, Defendant armed himself with a bayonet. Although Defendant and the victims were asked to leave the bar, the owner of the bar testified that there was no indication of trouble, and that Defendant appeared calm and not intoxicated. Once outside, Defendant pushed his wife. When Berry attempted to nonviolently intervene, Defendant stabbed him in the chest without warning and then chased him through the parking lot, stabbing him twice more. Finally, Defendant returned to his wife, stabbed her, and locked her in her car to bleed to death. The record reflects no proof that either victim threatened, assaulted, or otherwise provoked Defendant while outside of the bar.

After the murder, Defendant left the scene, disposed of the murder weapon, and tried to borrow enough money to flee. Nothing in the record suggests that he ever expressed any remorse. To the contrary, when he was arrested and told that he was being charged for murder, he callously asked, "Which one did I get?" We conclude that, along with the specific factors cited above, the totality of these circumstances was clearly sufficient to support the jury's finding of premeditation and intent beyond a reasonable doubt.

Having concluded that the proof was initially sufficient to support the jury verdicts, we address the Defendant's specific contentions regarding passion and intoxication. It is sufficient to note that, although the jury heard conflicting evidence on both issues, the evidence tending to disprove passion and intoxication was clearly sufficient for the jury to determine the issues accordingly. It was the jury's prerogative to credit the evidence in favor of the State's theory and to discredit the evidence in favor of Defendant.

With regard to passion, we add only that even if Defendant became impassioned upon hearing that Ms. Keough was with Berry, he had numerous opportunities to cool down prior to the killing. On the other hand, if he became impassioned later, but "the intent to kill was formed as a result of premeditation . . . prior to the crime, it is immaterial that the act was carried out in a state of passion." State v. Edwin Jesperson, No. 03C01-9206-CR-00212, 1993 WL 305781, at *7 (Tenn. Crim. App., Knoxville, Aug. 11, 1993) (citing Leonard v. State, 292 S.W.2d 849, 852 (Tenn. 1927)), perm. to appeal denied (Tenn. 1993). As discussed above, the evidence was sufficient for the jury to find premeditation, even prior to the circumstances immediately related to the killing. Thus, in addition to finding that the evidence was sufficient for the jury to conclude that Defendant was not impassioned, the evidence was also sufficient for the jury to conclude either that he had sufficient opportunity to cool down subsequent to any impassioned state, or that premeditation and the intent to kill were formed prior to any impassioned state.

Finally, we note that although this case centers around a marital dispute, that fact alone does not discredit the existence of a previously formed intent to

kill. See, e.g., State v. Cooper, 718 S.W.2d 256 (Tenn. 1986); State v. Jon Douglas Hall, No. 02C01-9703-CC-00095, 1998 WL 208051 (Tenn. Crim. App., Jackson, Apr. 29, 1998). Moreover, this was not a typical marital relationship. Defendant and his wife were separated, and Defendant lived with another woman. For the reasons discussed, we find that the evidence was clearly sufficient to support the jury's verdict on both counts. This issue is without merit.

## III. CONSTITUTIONALITY OF THE DEATH PENALTY

Relying upon arguments from his pretrial motions, Defendant also challenges the constitutionality of Tennessee's death penalty statute. This issue is without merit. See State v. Smith, 893 S.W.2d 908 (Tenn. 1994); State v. Brimmer, 876 S.W.2d 75 (Tenn. 1994); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994); State v. Smith, 857 S.W.2d 1 (Tenn. 1993); State v. Black, 815 S.W.2d 166 (Tenn. 1991); State v. Boyd, 797 S.W.2d 589 (Tenn. 1990); State v. Teel, 793 S.W.2d 236 (Tenn. 1990); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989).

## IV. SUFFICIENCY OF THE EVIDENCE TO SUPPORT DEATH PENALTY AND PROPORTIONALITY REVIEW

Although Defendant does not raise the issue, we also note that the evidence supports the jury's imposition of the death penalty. At sentencing, the State introduced Defendant's prior convictions for assault to commit voluntary manslaughter in 1974 and for manslaughter in 1989. Defendant was on parole for the latter offense at the time he committed the present offense.

At the sentencing hearing, one of Defendant's sisters testified on his behalf that he was one of eight siblings and that their parents were deceased. She stated that Defendant was fifty-three years old, that he was a cordial and very nice person, and that she loved him. She then asked the jury to spare his life. Another sister testified that Defendant and Ms. Keough had experienced a "stormy" relationship from the beginning. She mentioned that Defendant had undergone stomach surgery and that he had had his jaw wired shut as result of a car accident. She, too, asked the jury for leniency and said that Defendant could be rehabilitated.

A former co-worker testified that Defendant had performed his work well. He also recalled a time about a month prior to the murder when Ms. Keough came to the body shop where he and Defendant worked. The witness stated that she and Defendant began to argue about a car he had bought for her and that Ms. Keough had grabbed an air ratchet and "rared back" to hit him before another employee intervened and took the tool from her.

The State's sentencing evidence was sufficient to establish the prior violent felony aggravating circumstance. See Tenn. Code Ann. § 39-13-204(*i*)(2). Evidence that Defendant had previously killed another person and feloniously assaulted yet another victim clearly outweighed the brief character testimony introduced by the defense. Therefore, we conclude that the evidence was sufficient to support imposition of the death penalty.

Defendant also does not challenge the proportionality of his death penalty in comparison to similar cases. In accordance with Tennessee Code Annotated

§ 39-13-206, we nevertheless examine the issue. When this Court conducts a proportionality review, we must consider the characteristics of Defendant and the nature and circumstances of the crime in comparison to other first degree murder cases in which a capital sentencing hearing was conducted, regardless of the sentence actually imposed. See State v. Bland, 958 S.W.2d 651, 666 (Tenn. 1997). A sentence of death is not disproportionate unless "the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. at 668 (taking language from State v. Ramsey, 864 S.W.2d 320, 328 (Mo. 1993) (en banc)). That is not the case here.

Defendant, armed with a bayonet, sought out his estranged wife. The only testimony regarding his state of mind when he learned that his wife was at the bar with Berry indicated that he was calm and collected. He stabbed his wife in cold blood, locked her in her car, and left her to bleed to death. He has shown no remorse for his actions. He has two prior convictions involving the killing or attempted killing of other persons. Prior efforts to rehabilitate him were obviously unsuccessful. Finally, no other characteristic of Defendant in any way suggests that his sentence is disproportionate. The mitigating proof, as delineated above, was hardly compelling, and the jury's decision not to defer to such proof does not indicate a disproportionate sentence.

The sole aggravating circumstance was that Defendant had previously been convicted of one or more felonies for which statutory elements involve the use of violence to the person. See Tenn. Code Ann. § 39-13-204(i)(2). The death penalty has been sustained in a number of prior decisions in consideration

of this factor.  See, e.g., State v. King, 718 S.W.2d 241 (Tenn. 1986); State v. Goad, 707 S.W.2d 846 (Tenn. 1986); State v. McKay, 680 S.W.2d 447 (Tenn. 1984).  Moreover, the death penalty has been sustained when, as here, this was the only aggravating factor.  See, e.g., State v. Martin, 702 S.W.2d 560 (Tenn. 1985); State v. Caldwell, 671 S.W.2d 459 (Tenn. 1984).  We conclude that the sentence of death in the present case is not disproportionate.

The judgment and sentences[1] of the trial court are affirmed in all respects.


_____
DAVID H. WELLES, JUDGE


CONCUR:


Not Participating_____
PAUL G. SUMMERS, JUDGE


_____
JOE G. RILEY, JUDGE

---

[1] The appellant does not challenge the appropriateness of the forty-year consecutive sentence for attempted murder.